**ARMOR BRONZE & SILVER CO., Inc.**

v.

**Gerayne C. CHITTICK.**

**Civ. No. 9840.**

United States District Court
D. Connecticut.
Sept. 4, 1963.

Palmer S. McGee, Jr., Day, Berry & Howard, Hartford, Conn., Alan P. Cusick, Providence, R. I., for plaintiff.

George C. Hastings, Robinson, Robinson & Cole, Edward F. Hennessey, III, Hartford, Conn., for defendant.

ANDERSON, Chief Judge.

Findings of Fact:

1. Armor Bronze & Silver Co., Inc. is a Massachusetts corporation having its manufacturing plant and principal place of business in Taunton, Massachusetts. It makes and sells merchandise made of copper. Its sales division operated under the name of Coppercraft Guild. It is the plaintiff in this action and will hereinafter be referred to as "Armor". The defendant is a citizen of Connecticut.

2. Armor's gross national sales in 1962 amounted to $5,280,000. Five per cent. or $264,000 worth of these sales originated in Connecticut. It has not qualified with the Secretary of the State of Connecticut to transact business in this State.

3. Armor marketed its products in Connecticut through a system of retail selling known as "the party-plan", which it adopted in 1949 and was still using at the time of the trial. Under the party-plan, sales representatives of Armor, for a promised consideration, induced housewives, who met certain general qualifications prescribed by Armor, to invite to their homes prospective customers for Armor's products. The hostess, through the use of her home, provided a properly furnished place where samples of Armor's products could be displayed, usually by candlelight, and where a "sales-pitch" might be delivered to the prospective purchasers in an atmosphere and surroundings conducive to buying.

4. Armor maintained above the hostesses a hierarchy of "field representatives", residents of Connecticut, who were set up in various tiers of authority and functions, designated from top to bottom as (1) regional manager, (2) district manager, and (3) counselors. Armor promulgated strict standards of qualification for each of these positions and passed upon individual applications for them.

5. The defendant was a regional manager and her territory consisted of the entire State of Connecticut and Western Massachusetts. The functions of the regional manager were: recruiting district managers and counselors, training field representatives, activating sales people, helping them with their problems, stimulating sales, adjusting complaints for the company and expending

company funds to pay C.O.D. charges where necessary to retrieve goods for the company not paid for by the buyer.

6. District managers recruited, trained, and advised counselors and assisted in stimulating sales. They also at times acted as counselors. In the sixteen months prior to this action, there were six or seven district managers in Connecticut.

7. The counselor was the basic sales person in the party-plan system. It was her task to contact individual Connecticut housewives and to persuade them to act as hostesses. She also trained the hostesses and acted as their counselor. At the parties held at the hostesses' homes the counselor presented a show of Armor's products, distributed advertising literature and solicited orders from the guests. The counselor also recruited guests to act as hostesses at future parties. She solicited opinions from guests on the worth of Armor's products, expedited the handling and delivery of goods and handled complaints.

8. During the sixteen months preceding the commencement of this suit, there were approximately sixty-five counselors who operated in Connecticut and who gave approximately 3,923 shows.

9. The "party-plan" operated as follows: A counselor contacted a Connecticut housewife, qualified under standards set up by the company, and solicited her to act as a hostess for a Coppercraft party to be held at the hostess' home. As an inducement to the housewife to accept the proposal, she was promised gifts and credit toward additional gifts, manufactured and furnished by Armor, to be determined on the basis of the number attending the party and the value of sales made and the number of new recruits as hostesses obtained at the party. If the housewife accepted, she would then be provided with a guide book published by Armor and furnished her by the counselor. She would also be coached by the counselor and supplied with a folder containing price lists, advertising material and order blanks, all published by and furnished by Armor.

The hostess thereafter contacted her friends and neighbors and asked them to attend the party at her home at a particular time. The average attendance at such parties was twelve. Armor considered twelve as a desirable minimum. At the party refreshments were provided by the hostess and the counselor displayed Armor's products and distributed advertising literature. The display of merchandise at a party consisted of 95 pieces. Each carried the plaintiff's name and the price of the item. There might also be displayed more elaborate advertising brochures published by Armor and purchased by a counselor or the district manager at a nominal price.

10. The counselor discussed the various items with the guests and each guest was given an order form bearing at the bottom in small print the words "All selections subject to acceptance of orders by Coppercraft Guild, Taunton, Mass." The matter of the acceptance of orders at Taunton was never mentioned or called to the attention of the guests by hostesses, counselors or district managers, nor was any question ever raised about it by a guest. Armor never directed its counselors to point out this condition to guests or to discuss it with them. That the guest buyer's selections were subject to acceptance of orders by Coppercraft Guild at Taunton, Mass., never became a part of the understanding of the guest buyer and was never made a part of the sales agreement by Armor's sales representatives or by the hostesses. The hostess was not advised that she was not authorized to be an agent of Armor. The contracts for the purchases and sales of pieces of copper merchandise were made at the homes of the hostesses in Connecticut.

11. The guest listed on the form the items she wished to purchase, and the counselor filled in on the form a delivery date which had previously been furnished to her by Armor. The guest might then and there pay the hostess or counselor in full or give the hostess a deposit on the purchase; but in any event, the guest would be instructed to

pay the hostess in full prior to the designated delivery date. The original order form was kept by the hostess; a copy was given to the guest; a copy was sent to the company and a copy was retained by the counselor. A door prize, which was a piece of merchandise manufactured by Armor and purchased from Armor by the counselor, was usually given away at the parties.

12. After all orders were received, the counselor re-entered them on a master order form. This form also had printed upon it in small letters "All orders subject to acceptance at Coppercraft Guild, Taunton, Mass. Hostess is not deemed to be an agent of Coppercraft Guild. Title to merchandise passes at Taunton, Mass." For the purchase of any item which the hostess herself might wish to make, she made out a slip and attached her check for the amount due, payable to Coppercraft Guild (Armor), which was turned over to the counselor. Armor at no time accepted orders or checks sent to it directly by an individual purchaser but required that the order be sent via the counselor and that payment be made through the counselor or hostess.

13. When the order forms were received at Taunton, they were processed by clerical employees. No review of the orders was made by anyone in the company at Taunton who was authorized to enter into a sales contract; no formal act of acceptance with regard to the written orders was performed by anyone and no notification of acceptance was sent to the guests, but a letter was sent to the hostess advising her of the approximate delivery date of the merchandise. No orders were rejected by Armor although some required corrections after which the orders went through.

14. The goods were then shipped C. O.D. to the hostess who paid the charges and advised the guests that the goods had arrived. For her services the hostess was permitted to choose various items of merchandise, the value of which was determined by the number of guests attending the party and the total value of the orders taken.

15. If, because of the failure of a guest to pay the purchase price to the hostess, the hostess did not have sufficient funds to meet the C.O.D. charges, Armor supplied a fund, administered by the regional manager and the counselor, through which the hostess could get the necessary funds and pay the full C.O.D. charges. The merchandise marked for the non-paying guest would then be returned to the company.

16. In addition to sales made through the use of the Armor guest order form at hostesses' parties, a substantial number of sales were made by hostesses and counselors through outside orders, mostly by telephone, in which Armor's guest order form was not used by the buyer. In such instances checks, made out either to Armor or the counselor, were sent by the buyer to the hostess or counselor; the buyer was not sent or shown a copy of the Armor order form nor was the buyer informed that her order was subject to acceptance by Armor in Taunton, Massachusetts. Orders of this type constituted approximately 10% to 15% of a manager's total orders. As the total volume of sales in Connecticut for the year February 1, 1962 through January 31, 1963 amounted to $270,402, such extra party orders approximated $30,000 a year. The plaintiff was fully aware that sales were made in this way and never prohibited such activity. Goods for such orders were shipped to and delivered by the counselors.

17. The regional manager, district managers and counselors received commissions on the sales made. In addition, they received certain extra payments where sales exceeded a certain total. Regional managers and district managers received payment for training counselors in Connecticut. This payment was computed on the basis of $10 per counselor after the new counselor had sent in $300 worth of business to Armor. The manager was paid $15 more when the new counselor's business reached $500.

18. The defendant, as regional manager, trained a few regional managers

in Connecticut for service in other states. The training of each lasted a week and was conducted in Connecticut at such times and places as Armor directed. Armor paid all the expenses and compensated the defendant as regional manager in Connecticut in the amount of $100 for this service.

19. Whenever a person was recruited as a counselor, she would sign a contract with Armor under the name of "Coppercraft Guild by _____." This contract was accepted in writing for Armor by the regional or the district manager. It provided, among other things, that the counselor was an independent contractor, that she had no authority to bind Armor, that all orders were accepted only at Taunton, Massachusetts, and that Armor was not liable for any expenses or claims relating to a counselor's activities.

20. The regional manager and district managers, when they took office, also signed a similar contract directly with Armor under the name of Coppercraft Guild.

21. The merchandise of Armor displayed at the hostesses' parties consisted of a sample kit. These sample kits were the property of Armor and were rented to counselors on a lease-purchase arrangement. For each showing the counselor paid from her commissions either one or two dollars, depending on the amount of orders sent to the company, toward the cost of the sample kit. The cost to each counselor for the entire kit was $155. When a counselor paid $155, she paid no more and the kit was hers upon her termination as a counselor. If a counselor terminated her association with Armor before paying the $155, she could get the kit by paying the balance plus $15. If, however, a counselor did not pay this balance, she returned the kit to Armor and forfeited any credit she had earned. Repossessed kits were rented and/or sold to new counselors.

22. Between February 1, 1962 and January 31, 1963, the average number of counselors in Connecticut was sixty-five. As each counselor had a kit under this arrangement Armor had from this source a potential annual rental income of a little over $10,000.

23. Each manager kept her own records of her sales activities. This was done at the direction of Armor. Weekly reports were filed with the regional manager on forms furnished by Armor. The regional manager then sent weekly reports of the activities of district managers and counselors to Armor on postcards furnished to her by Armor. In addition, the company furnished all managers with I.B.M. sheets showing the volume of sales of each counselor. Forms supplied without charge by Armor were its property and were repossessed from a counselor or manager who had terminated her connection with the company.

24. Expenses of managers and counselors such as telephone, travel, stationery, and advertising were borne by themselves, except for the forms and some advertising material furnished by Armor. Armor also in one or two instances reimbursed a manager for newspaper advertising and in 1962 ran a two-week series of one minute spot ads on T.V. relating to recruiting counselors in Connecticut. It maintained no office or other permanent facilities or any telephone listing under the name Armor or Coppercraft Guild.

25. Armor exercised supervision and control of managers and counselors to a marked degree. Armor's East Coast Sales Manager came to Connecticut every four to five weeks. On these occasions he would conduct regional meetings or rallies, attended usually by the regional and district managers and counselors. He gave instructions called "suggestions" concerning the conduct of the business in Connecticut and means of stimulating sales. These meetings would be held at Connecticut restaurants, and on many occasions Armor would pay the cost of food and drink. The company published a weekly paper called "Timely Topics", which was mailed to all counselors and managers, and which on occasion included enunciations of company policy and

rules. In addition to "Timely Topics" the company included statements of policy and rules in other printed literature mailed to counselors and managers. Statements of this nature were also found in the published book, "A Guide to Counselors". The company expected compliance by the managers and counselors with these statements. The company exercised the prerogative of promoting and demoting counselors and managers. In addition, it exercised coercive influence on the managers to terminate the contract of non-producing counselors. It required its managers to obtain the return of unpurchased sample kits from terminated counselors. This rule was enforced by the company by its refusal to issue new kits for the use of a new counselor unless the old kit was first returned. It set quotas for the addition of new counselors and threatened the discharge of managers who did not comply. The company required all managers to keep records of sales activities and to furnish weekly reports of same to the company. It determined the manner of and provided the means for training new counselors, and spelled out the manner in which Coppercraft parties should be conducted. The company authorized its managers to sign agreements with new counselors on behalf of Armor and authorized its counselors and managers to hold themselves out as agents of Coppercraft Guild (Armor).

Conclusions of Law:

1. This court has jurisdiction of the parties and the subject matter.

2. The plaintiff is transacting business in the State of Connecticut within the meaning of and in violation of Section 33–396 of the General Statutes of the State of Connecticut, Revision of 1958, as amended.

3. The plaintiff has no right to maintain an action in the courts of the State of Connecticut because of the provisions of Section 33–412 of said General Statutes.

4. The plaintiff has no right to maintain the present suit in this court and the action is, therefore, dismissed.

Discussion

■ This case brings to issue the question of what constitutes transacting business by a foreign corporation in the State of Connecticut, making it necessary for the corporation to procure a certificate of authority from the Secretary of the State, as required by Section 33–396 of the General Statutes of Connecticut, the pertinent portions of which read as follows:

"No foreign corporation * * * shall transact business in this state until it has procured a certificate of authority so to do from the secretary of the state. * * *"

A consequence of the violation of Section 33–396 is that the offending foreign corporation is barred from the use of the courts of the state under Section 33–412 of the Connecticut Statutes which in part provides:

"No foreign corporation transacting business in this state in violation of section 33–396 shall be permitted to maintain any action, suit or proceeding in any court of this state unless such corporation has obtained a certificate of authority."

This is a diversity action and, if the plaintiff is barred from the use of the courts of the State of Connecticut, it cannot maintain its suit in the United States District Court for the District of Connecticut. Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L. Ed. 1524 (1949), Arrowsmith v. United Press International, 2 Cir., 320 F.2d 219.

■ In judging whether or not particular activity is "transacting business" consideration must be given to Section 33–397 of the Connecticut Statutes which describes nine sets of circumstances which by law do not constitute transacting business. Those pertinent to this case are numbers 5 and 8 which read as follows:

" * * * (5) soliciting or procuring orders, whether by mail or through employees or agents or otherwise, where such orders require acceptance without this state before becoming

binding contracts; * * * (8) transacting business in interstate commerce; * * *."

The statute expressly states that it does not exclude other activities which may not constitute transacting business in Connecticut.

At the outset it should be stated that Armor's "operations established sufficient contacts and ties with the state of [Connecticut] to make it reasonable and just, according to our traditional conception of fair play and substantial justice, to permit the state" to subject Armor to the state's "transacting business" statutes. International Shoe Co. v. State of Washington Office of Unemployment Compensation and Placement, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Moreover, so substantial a portion of its activities were intrastate in character that, although it may have done interstate business as well, there can be no question that the State of Connecticut has the power to require Armor to get a certificate of authority to do business. Eli Lilly & Co. v. Sav-on-Drugs, 366 U.S. 276, 279, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1960).

Turning again to the Connecticut Statutes and their application, there are, on the one hand, cases where a house-to-house salesman for the foreign corporation simply takes orders with the explicit understanding that a binding contract will be made only when the order is accepted by the foreign corporation at a place outside of Connecticut and, on the other hand, cases where a foreign corporation by its authorized agents enters into contracts within the State of Connecticut on its behalf. The former are interstate commerce and come within the exclusionary definitions of Section 33–397 (5 & 8) of the Connecticut Statutes. They are the typical "drummer" cases. Robbins v. Shelby County Taxing District, 120 U.S. 489, 7 S.Ct. 592, 30 L. Ed. 694 (1886). See Eli Lilly & Co. v. Sav-on-Drugs, supra. The latter clearly come within the requirements of the Statute, and the foreign corporation must necessarily procure the certificate. Be-

tween these extremes lie a myriad of fact situations not clearly in one class or the other, but which must be adjudged as engaging or not in the transaction of business in the state.

The circumstances in many such cases are, as in the present case, often intentionally clouded by the foreign corporation in its effort to reap the advantages of an organized force of sales agents in the state, operating under its direction and control, making sales within the state in a temporary but attractive sales-inducing retail outlet and at the same time avoid the payment of a franchise fee, the corporate net-income tax, the filing of reports and other obligations which domestic and certified foreign corporations have to bear. The purpose of the statute, Section 33–396, is to afford domestic corporations assistance in bearing their share of the cost of the state's services rather than to require them to bear it alone and, as a practical consequence, suffer the serious competitive disadvantage which would result from permitting foreign corporations to carry on intrastate business unburdened by taxes and other duties.

Each case must be determined on its own set of facts which must be looked upon as a whole. That is to say, decisions of other states, not involving party-plan selling, are not particularly apposite and isolated factors, such as whether or not a foreign corporation has in the state an office with its name on the door or is or is not listed in its own name in the local telephone directory, are not in and of themselves determinative and may be among the facts found both in cases where a foreign corporation has been held to be transacting business and where it has not. Eli Lilly & Co. v. Sav-on-Drugs, supra; Alfred M. Best Co. v. Goldstein, 124 Conn. 597, 1 A.2d 140 (1938). In short, they are evidential but not conclusive. There is no reported case from the Connecticut courts dealing with a comparable fact situation.

In the present case the plaintiff asserts that its party-plan system of selling its

merchandise is only an elaboration of door-to-door selling, that, in effect, it is nothing more than a "drummer" case, that it is purely interstate commerce and comes within the exclusions of Section 33–397. To support this image of its activities it placed in its forms, used in dealing with its sales representatives and buyers in Connecticut, the correct legal verbiage and clauses, such as calling its managers and counselors "independent contractors" and having them admit in their employment contracts that they were independent contractors, having "no authority to act as agents on behalf of the company in any way"; by stating on the master order form that hostesses were not deemed to be an agent of Coppercraft Guild; by also placing on the master order sheet the words "all orders subject to acceptance at Coppercraft Guild, Taunton, Mass."; and by placing on the guest order slips the words "all selections subject to acceptance of orders by Coppercraft Guild, Taunton, Mass." The elaborate and detailed instructions, in booklet and periodical form as well as oral instructions, in accordance with which the sales system was established and operated, were carefully referred to as "suggestions". Instruction sessions held in the state by the area manager from the company were called "rallies".

All of the protective verbiage designed to show a simple "drummer" case situation, however, was in fact a subterfuge to cover quite a different set of legal relationships.

Although the regional manager was theoretically an independent contractor, which should make the district managers and counselors a part of her sales organization, the plaintiff, nevertheless, entered into separate contracts in its name with each district manager and counselor. These contracts were made in Connecticut, and the managers were authorized to sign them on behalf of the plaintiff.

Procuring and training of counselors was the key to the arch of Armor's party-plan system. The managers negotiated on behalf of Armor with prospective counselors and arranged with them in Connecticut for the lease-purchase agreements relating to the display kits. At no time did Armor reject such contracts or question the authority of the managers to make them. Armor realized at least $10,000 a year on the kit agreements alone, not including the sales made through bookings obtained by the counselors. The managers carried on training programs on behalf of Armor in the State of Connecticut, educating counselors and in some instances other managers for which they were compensated by Armor. They also on behalf of Armor adjusted complaints arising out of damaged merchandise, defective kits, change of guest's mind, and similar matters.

The counselors, though theoretically independent contractors, made contracts under Armor's sales system, on Armor's behalf, with "hostesses" who for a consideration, directly or indirectly, paid by Armor made portions of their homes temporarily available as display centers for plaintiff's merchandise and places where agreements for sale of plaintiff's products could be made. Armor prescribed the mode of payment to the hostesses. The counselor was authorized by Armor to display Armor's goods, each item of which displayed Armor's name and the price. She displayed no other manufacturer's goods. She appeared before the guest-buyers as Armor's sales representative; she aided and supervised the making of sales and answered inquiries. Although the master order sheet prepared and sent to Armor by the counselors said "title to merchandise passes at Taunton, Mass.", no statement of this sort was made to hostesses or guest buyers and Armor did not proceed on the assumption that this was so. If a buyer should fail to pay prior to receipt of the shipment by the hostess, Armor's operating procedure was to advance to the manager the C.O.D. charges which she would forward to the hostess and see to it that the merchandise was returned to Armor,

although theoretically title to it had previously passed to the buyer in Taunton.

In support of its effort to make it appear that its party-plan sales system amounted to nothing more than taking orders in Connecticut which required acceptance in Taunton, Massachusetts before becoming binding sales contracts, Armor relied upon the statement at the bottom of the guest selection order blank which said "All selections subject to acceptance of orders by Coppercraft Guild, Taunton, Mass." This statement appears on the order blank immediately under a double line, with which it is almost merged, and in small and very inconspicuous print. All mention of this provision and all references to and explanations of it were avoided at the party sales session. It was made abundantly clear that the amount due by each guest for her purchases was to be paid to the hostess in Connecticut prior to the delivery of the merchandise by the hostess to the buyer. The transaction which took place at the sales party was, in effect, a promise by the hostess on behalf of Armor to deliver specific items of merchandise to the buyer, and the buyer promised to pay the amount due prior to the receipt of the merchandise by the hostess. It was a sales agreement made in Connecticut between an agent for Armor and a purchaser.

That the guest buyer's selections were subject to acceptance of orders by Coppercraft Guild at Taunton, Mass., never became a part of the understanding of the guest buyer and was never made a part of the sales agreement by Armor's sales representatives or by the hostesses. The sales procedure was such that any reasonable guest would believe that she was then and there buying a piece of copper merchandise for which she had promised to pay a certain amount and which would be delivered to her by the hostess at a later date. Nor had the guest any reason not to suppose that the hostess was the authorized representative of the company, and she had every reason to suppose that the counselor, who was present and supervising the whole sales

procedure, certainly was. While the counselor's master order sheet stated that the hostess was not an agent of the company this was never in any way brought to the attention of the hostess or of the buyer guests. If it had, the buyer guests would obviously have been reluctant to pay the purchase price to someone who did not represent the company.

Even if the court had been able to find that the sales made at the parties were simply orders subject to acceptance by Armor in Taunton, Mass., a substantial amount of sales by counselors and hostesses was made outside of parties and were not made subject to acceptance in Taunton. As stated above, these sales totaled approximately $30,000 for the year February 1, 1962 to January 31, 1963. Although the wording of the contract with the counselors would appear to prohibit such action, the company was well aware of it and acquiesced in it. The counselors collected the money in Connecticut, usually by check made payable to Armor, and Armor sent the merchandise directly to the Connecticut purchaser or to the counselor for delivery to the purchaser. These were clearly intrastate sales.

While the plaintiff has laid great emphasis upon the independent contractor status of the sales representatives in Connecticut, an independent contractor may be and often is the agent of the person who engages him. Restatement of Agency, 2d, Section 2. In its verified complaint, the plaintiff at one point alleged that its counselors and district managers in Connecticut were its agents. Although it is, therefore, not essential to a decision of the primary issue in this case, nevertheless, it may be said that the plaintiff exercised a tight, detailed and continuous control over its sales representatives and the conduct of sales parties. The system was originally formulated and was strictly supervised by the plaintiff. In the great majority of instances its "suggestions" were treated and followed as orders. The managers were for the most part the liaison of-

ficers for the transmitting and carrying out of these orders. In addition, the company sent to all counselors and managers a weekly publication called "Timely Topics". The printed literature, counselors' guides, suggestions to hostesses and other publications, as well as regional meetings and rallies, offered both promises and threats—the use of the carrot and the stick. The company made it plain that it expected compliance by the managers and counselors with the procedures outlined by the company. Enforcement was sought by more than persuasion. The company exercised the prerogative of promoting and demoting counselors and managers; it exercised coercive influence on managers to terminate contracts of non-producing counselors, it set quotas for the addition of new counselors and threatened to discharge managers who did not meet them. It required the managers to obtain the return of unpurchased sample kits from counselors who had terminated their connection with the company. This rule was enforced by the company by its refusal to issue new kits for the use of a new counselor until the old kit was returned.

The court can reach no other conclusion but that the plaintiff, Armor Bronze & Silver Co., Inc., has been engaged in intrastate commerce in the State of Connecticut. The way it actually carried on its activities and conducted its sales systems in Connecticut speak more loudly than the legal terms used to describe relationships between itself, its sales representatives, and its buyers, as appear in the wording in its contracts and forms. This dichotomous endeavor on the part of Armor was motivated by its desire to reap the fruits of intrastate selling and at the same time keep its immunity from the taxes and the other obligations which it would have to assume as a certified foreign corporation.

The argument has been advanced that the trend of modern decisions has created a two-fold definition of the words "transacting business". It is asserted that the trend is toward an ever broadening definition of "transacting business" for the purpose of finding a foreign corporation amenable to service of process; and a constantly narrowing definition of "transacting business" for the purpose of requiring registration of a foreign corporation, particularly where a violation of the requirement results in barring the foreign corporation from suing in the state courts. Changes of this kind have been made in Connecticut by way of legislative enactment. Section 33–397 has done this with regard to the interpretation of "transacting business" where the necessity for certification is involved. The statute recognizes that there may be other sets of facts which will not constitute transacting business. But this is not to be interpreted as a direction to the courts to give an ever narrowing interpretation to those words. Section 33–411 has facilitated the service of process on foreign corporations but has done so without broadening the definition of the words "transacting business"; nor is there in this statute any direction to the courts to adopt a constantly broadening definition of the words. This court is governed by Connecticut law, and it can find no authority, either in the statutes or the case law, which calls for a dual definition of "transacting business"; in fact, the cases define the words similarly whether they are dealing with the requirement that a foreign corporation be certified or are dealing with amenability to service of process. Alfred M. Best Co. Inc. v. Goldstein, 124 Conn. 597, 1 A.2d 140, Conn. Tool & Mfg. Co. v. Bowsteel Distributors, Inc., 24 Conn. Sup. 290 (1963). Moreover, the denial of the use of the Connecticut courts is not so drastic a sanction that considerations of fairness call for a very narrowed definition, because the foreign corporation's right of action is not lost, and the courts will forthwith be opened to it the moment it is certified by the Secretary of the State. Under the circumstances of the present case the courts of Connecticut would be barred to the plaintiff. It, therefore, cannot pursue the present action here, and it is dismissed.